386 P.2d 846

**TRUCK INSURANCE EXCHANGE, a California corporation, Appellant,**

v.

**L. N. HALE, doing business as Hale's Towing Service, Appellee.**

**No. 7059.**

Supreme Court of Arizona,

En Banc.

Nov. 21, 1963.

Westover, Mansfield, Westover & Copple, Yuma, by Tom Choules, Yuma, for appellant.

Brandt & Baker, Yuma, by Thadd Baker, Yuma, for appellee.

BERNSTEIN, Chief Justice.

Appellant insurance company was defendant in a suit on a fire insurance policy. A verdict and judgment were rendered against defendant. Defendant made several motions: a motion for a directed

verdict at the end of plaintiff's case and at the close of all the evidence and a motion for judgment n. o. v. Defendant now appeals, in part, the denial of these motions. So far as that denial is concerned, this court must draw from the evidence all reasonable and justifiable inferences favorable to the verdict. Tucson Title Ins. Co. v. D'Ascoli, 94 Ariz. 230, 383 P.2d 119.

Viewed in that light the evidence is as follows. Plaintiff owned a two and one-half ton wrecker. On the afternoon of the fire he had been using the wrecker to move old cars from one yard to another. At the time he began moving the cars he started a fire to burn a truck body. When he had finished moving three cars, he parked the wrecker about 75 feet from the fire and then left the yard with his brother-in-law. They had a drink of water, sat on the porch of a house for a few minutes and then plaintiff went back to the yard to unhitch a car from the wrecker. He found one of the rear tires partly flat and after trying to fix it went to a house about six hundred yards away to telephone. As plaintiff arrived at the house the occupant heard some popping noises, looked toward the yard, and saw smoke coming from the wrecker. Plaintiff also heard the popping noises and testified that when tires are heated enough they will explode. Plaintiff then went to a different yard to keep an appointment. When he returned to the yard where the wrecker was he found it had been moved from 50 to 60 feet from

where he had parked. He decided the fire had been intentionally started and called the sheriff's office. Remains of burned tires were found under the front end of the wrecker and an expert testified that the fire had been set by pouring some inflammable liquid over the wrecker. Plaintiff telephoned a person from whom he was to get another wrecker and told him that plaintiff's wrecker had burned up.

■ Defendant contends that the fire was set and urges that, because of testimony as to the times plaintiff made his phone calls and was at various places, he must have been the one who set the fire. There is conflicting evidence as to these times. The jury believed the plaintiff's testimony and where the evidence is conflicting we will not disturb the finding of the jury. Standard Oil Co. v. Shields, 58 Ariz. 239, 119 P.2d 116.

At the trial one of the defenses was that plaintiff had not filed a proof of loss form within 60 days as required by the policy and therefore could not collect under the terms of the policy. To counter this, plaintiff offered testimony, a letter from defendant company showing that defendant had attempted to settle the claim with plaintiff, and a memorandum from the claims manager of the company that plaintiff refused the amount authorized in settlement. The fire occurred on the first of May and was reported to the company on the second of May. Subsequently two

agents of the insurance company took full statements from the plaintiff. On June 23 defendant's claims manager started negotiations with plaintiff and on June 25 the claims manager received the following letter from his home office:

"Have insured come to your office in El Centro [Calif.] and point out to him that we have considerable evidence which indicates the fire did not occur as he claims but that in order to bring the matter to a conclusion without further delay and expense to both parties we would be willing to compromise the loss. We * * * suggest you begin negotiations by offering fifty percent."

The claims manager had authority from his company to offer plaintiff up to $6,894 in settlement of the claim. The claims manager then offered plaintiff 50% in accordance with his authorization in settlement which plaintiff refused. Plaintiff made a counter offer of $7,500, on July 1, the 61st day after the fire. On that day the claims manager told plaintiff that his authority to settle went no higher than $6,894. Plaintiff would not accept such an amount. At no time did the company furnish or suggest that plaintiff file a notice of proof of loss. Plaintiff did not file a notice of proof of loss. All of the information which would have been included in a proof of loss form was in the hands of the company by way of statements given by plaintiff.

The trial court instructed the jury:

"There has been admitted in this case evidence of an offer on the part of the defendant to pay to the plaintiff the sum of $3,447 in settlement of defendant's liability under the policy of insurance issued by the defendant. You are instructed that any offer made by the defendant to settle the claim of the plaintiff is not to be considered by you as an admission of liability on the part of the defendant and you shall disregard such evidence in determining the liability, if any, of the defendant."

The general rule and one which we here reaffirm is that settlement negotiations are not admissible in evidence, Leigh v. Swartz, 74 Ariz. 108, 245 P.2d 262. But at common law an almost universal exception to this rule is that under certain circumstances settlement negotiations or compromise offers are admissible to show waiver by the company of the filing of a proof of loss form, LeMars Mut. Ins. Co. v. Tasler, Iowa, 118 N.W.2d 524 and see anno. "Insurers admission of liability, offers of settlement, and negotiations for adjustment or settlement as waiver of proof of property loss" 49 A.L.R.2d 87. Evidence not admissible for one purpose may be admissible for some other legitimate purpose, Leigh v. Swartz, supra.

Defendant, however, refers us to A.R.S. § 20–1130 which reads in applicable part:

"Without limitation of any right or defense of an insurer otherwise, none of the following acts by or on behalf of an insurer shall be deemed to constitute a waiver of any provision of a policy or of any defense of the insurer thereunder:

* * *

"3. Investigating any loss or claim under any policy or engaging in negotiations looking toward a possible settlement of any such loss or claim."

Defendant correctly contends that this statute was part of a very comprehensive insurance statute. He urges on us a construction of the statute which would abrogate the common law rule as to waiver of the proof of loss. Before we can accept such a construction we must consider the legislative history and the purpose of this comprehensive insurance statute.

In Paul v. Virginia, 8 Wall 168, 19 L.Ed. 357 (U.S.1868) the United States Supreme Court decided that the business of insurance was not in "commerce". For the next 75 years the insurance industry was under no federal legislation and was subject to only minimal state regulation. In 1944, the United States Supreme Court overruled Paul v. Virginia, supra, and in United States v. Southeastern Underwriters Association, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 held insurance to be "in commerce" and taking the indictment to be true, engaging in practices in violation of the antitrust laws. The decision in Southeastern Underwriters "created consternation in the insurance business."[1] As a result of Southeastern Underwriters, congress passed an enabling act under which the states could continue to regulate insurance but provided that the business of insurance was subject to the Sherman Act, the Clayton Act, and the Federal Trade Commission Act "to the extent that such business is not regulated by state law."[2] State regulation must be effective, see e. g. F. T. C. v. Travelers Health Asso., 362

1. Sen. McCarran, 91 Cong.Rec. Part II p. 1443. And see House Rep. No. 143, Feb. 13, 1945: " * * * many insurance companies have refused, while others have threatened refusal to comply with State tax laws, as well as with other State regulations, on the ground that to do so, when such laws may subsequently be held unconstitutional in keeping with the precedent-smashing decision in the Southeastern Underwriters case, will subject insurance executives to both civil and criminal actions for misappropriation of company funds."

2. 15 U.S.C.A. § 1012(b) "No act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law."

U.S. 293, 80 S.Ct. 717, 4 L.Ed.2d 724. The purposes of the enabling act are clear from the committee report and from the debates in congress and the purposes were to secure more adequate regulations and control of the insurance industry.[3] This regulation was to keep the industry from acting in a manner which was against the public interest,[4] and for the protection of policy holders.[5] The most critical part of the bills were the rating sections and by 1948 these had been passed in more than thirty states.[6] The other provisions of the bills were passed through the state legislatures at a slower rate.

By 1954 the Arizona legislature enacted all the regulatory statutes "in the public interest" and "for the welfare of the policyholders" sanctioned by 15 U.S.C.A. § 1011 et seq. This statute, A.R.S. Title 20, is remedial only as to the regulation of insurance in the public interest. It will be strictly construed in favor of the rights of the policyholders and the public. Our interpretation was given to the identical language here under consideration in the Louisiana statute by the federal court interpreting Louisiana state law in Mier v. Niagra Fire Ins. Co., D.C., 205 F.Supp. 108, 109, when it said:

"Admittedly, the actions of the insurer's agents in investigating the fire cannot constitute waiver of proof of loss, however, it appears from the affidavit of Agent Domingue, that the respondent, by its actions and conduct, gave the insured substantial grounds for [his] believing that no further action on his part was required."

And see Schecter v. Camden Fire Ins. Asso., La.App., 141 So.2d 451 in which the same result was reached without mentioning the existence of the statute.

3. "What is more, the congress proposes by this bill to secure adequate regulations and control of the insurance business."

\* \* \*

"Enactment of this bill will (1) remove existing doubts as to the right of the states to regulate and tax the business of insurance, and (2) to secure more adequate regulation of such business." House Report No. 143, supra.

4. "Mr. O'Mahoney \* \* \* I do not conceive this to be a grant of power to the states to authorize by permissive legislation obviously adverse combinations which would be against the public interest." Cong.Rec. Vol. 91 Part II p. 1444. And see Debates Cong.Rec. Vol. 91 Part II pp. 1442–1445.

5. "Opportunity is granted to the state legislatures during their present and forthcoming sessions for 1945, 1946 and 1947 *to consider the welfare of the policyholders*." House Rep. 143, supra. (Emphasis supplied.)

6. Insurance and the Anti Trust laws—a problem in synthesis, 61 Harv.L.R. 246. These state laws permitted combinations of companies which otherwise would be in violation of the Anti Trust Laws. They were not intended, however, to force companies who wished to compete to join such combinations or to authorize legislation which would in any way limit competition by those companies that wished to do so. 91 Cong.Rec. Part II pp. 1442–1445, 1477–1488; House Report No. 143, supra.

The question here is are the circumstances of this case such as to show waiver at common law of the notice of proof of loss. The test has been variously stated. In LeMars Mutual Ins. Co. v. Tasler, Iowa, 118 N.W.2d 524, 527–528, the court said:

"At the expense of slight repetition, and to summarize the crux of the matter in the case at bar is: Did plaintiff and its agents acquire complete information about the fire and the property damage? Having such knowledge did they act and talk in such a manner that they lulled Mr. and Mrs. Tasler into believing that a formal proof of loss was not required? Plaintiff's agents did so act and talk. Defendants did so believe."

And see Mier v. Niagra Fire Ins. Co., supra; anno. 49 A.L.R.2d 87, supra.

■■ And as has been previously noted the defendant was still negotiating with plaintiff through the 61st day—one day after the time in which to file a proof of loss form had passed. As was said in N. Y. Underwriters Ins. Co. v. Noles, 101 Ga.App. 922, 115 S.E.2d 474, 477:

"An insurance company cannot, by its own acts of continuously negotiating a settlement through a time period within which the insured must file a sworn proof of loss, thereafter insist on a strict compliance with the contractual provision when the insured has been mislead into believing that no other requirement was necessary to a settlement."

The evidence was properly admitted on this question of waiver.

■ Defendant also contends that the trial court did not submit the question of waiver to the jury and that he should have done so. In general the question of waiver of proof of loss is a jury question, but we need not decide whether the trial judge erred in holding as a matter of law that the requirement of filing a proof of loss had been waived in this case. The requirement that a proof of loss be filed will be most strongly construed against the company. Watson v. Ocean A & G Corp., Ltd., 28 Ariz. 573, 238 Pac. 338. The requirement in the policy that a proof of loss be filed reads:

"When loss occurs, the named insured shall:

* * *

(b) file proof of loss with the Exchange within sixty days after the occurrence of loss, unless such time is extended in writing by the Exchange, in the form of a sworn statement of the named insured setting forth the interest of the named insured and of all others in the property affected, any encumbrances thereon, the actual cash value thereof at time of loss, the amount, place, time and cause of such loss, the

amount of rental or other expense for which reimbursement is provided under this policy, together with original receipts therefor, and the description and amounts of all other insurance covering such property."

█ A few days after the fire an adjuster for the company interrogated the plaintiff as to the fire and tape recorded the conversation. Within the sixty day period the plaintiff signed a written statement as to the fire prepared by a fire marshal hired by the company to investigate. The statement was taken from plaintiff before a secretary who took it down in shorthand and transcribed it. The statement was then signed by the plaintiff and was delivered to the company. The company admitted that all information which it would have obtained from a formal verified proof of loss form was in its files. It was admitted that the loss was total except for salvage. We hold that there was substantial compliance with the proof of loss requirement because all of the pertinent information had been supplied the company and the loss was total. Mier v. Niagra Fire Ins. Co., supra.

Affirmed.

STRUCKMEYER, JENNINGS, and LOCKWOOD, JJ., concurring.

UDALL, Vice Chief Justice (concurring).

The court decides that plaintiff's detailed statement of loss amounted to substantial compliance with the proof of loss requirements in the policy. It thus becomes unnecessary to consider whether error was committed by taking the question of waiver from the jury. I agree with both conclusions and for that reason concur in the result.

But I take objection to the implications that evidence of settlement negotiations between company and claimant is properly admissible to establish waiver when that issue is decisive. Admittedly, this was the rule at common law. In 1954, however, our legislature provided that, Investigating any loss or claim * * * or engaging in negotiations looking toward a possible settlement" should not constitute waiver of "any provision of a policy or of any defense of the insurer thereunder." A.R.S. Section 20–1130. In my view, the common law doctrine was thus abrogated and evidence of negotiations made thenceforth inadmissible on questions of waiver, as on questions of liability generally. Leigh v. Swartz, 74 Ariz. 108, 245 P.2d 262 (1952); Fries v. Anderson, Clayton & Co., 190 Cal. App.2d 667, 12 Cal.Rptr. 336 (Ct.App.1961).

Because insurance legislation is designed to safeguard the welfare of policyholders does not mean that every section of the code must give the insured some advantage over the company. The section under ques-

tion appears to be nothing more than an extension of the familiar principle that compromises are favored by the law. See Schneider v. McAleer, 39 Ariz. 190, 4 P.2d 903 (1931). I cannot see that it imposes an undue hardship on claimants to insist that they comply with all the requirements of their contract. Precisely because "state regulation must be effective," I would exclude evidence of negotiations, giving the statute the only interpretation to which I believe it is susceptible.